JUDGE CASTEL

# 21 CV 04406

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Castle Apparel Limited and TAL Apparel Limited,<br><br>           Plaintiffs,<br><br>v.<br><br>Claudio Del Vecchio, in his individual capacity and as Trustee of The Del Vecchio Family Trust; Matteo Del Vecchio, an individual; Peak Trust Company, as Trustee of The CDV Trust, as Trustee of The CDV 2010 Annuity Trust, and as Trustee of The CDV 2015 Annuity Trust; DV Family LLC; and Delfin S.A.R.L,<br><br>           Defendants. | CASE NO. _____ |

## COMPLAINT

Plaintiffs Castle Apparel Limited ("Castle") and TAL Apparel Limited ("TAL Apparel") (together, "Plaintiffs" or "TAL"), by and through their undersigned attorneys, for their Complaint against Defendants Claudio Del Vecchio, in his individual capacity and as Trustee of The Del Vecchio Family Trust; Matteo Del Vecchio, an individual; Peak Trust Company, as Trustee of The CDV Trust, as Trustee of The CDV 2010 Annuity Trust, and as Trustee of The CDV 2015 Annuity Trust; DV Family LLC, and Delfin S.A.R.L (collectively, "Defendants" or the "Del Vecchios"), allege, on knowledge as to their own acts, and on information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.     This is an action to require Claudio Del Vecchio, the former Chairman and Chief Executive Officer of Brooks Brothers Group, Inc. ("Brooks Brothers" or the "Company"), Matteo

1

Del Vecchio, Claudio's son and Brooks Brothers' former Chief Administrative Officer and board member, and their controlled affiliates and entities, which were majority shareholders of Brooks Brothers, to fulfill their contractual and fiduciary obligations to TAL, Brooks Brothers' minority shareholder and investor.  The Del Vecchios breached their obligations and abused their position of power at Brooks Brothers when they put their own financial interests ahead of those of the Company.  The Del Vecchios refused to pursue bids for the acquisition of Brooks Brothers in 2019 that would have yielded hundreds of millions of dollars for Brooks Brothers' shareholders, including TAL, because those bids would have triggered the Del Vecchios' obligation under their Stockholders Agreement with TAL to pay millions of dollars to make TAL "whole" on its equity investment.  To avoid millions of dollars of personal liability to TAL, the Del Vecchios refused to consider a sale of Brooks Brothers unless TAL would agree to reduce or waive its make-whole right.  When TAL refused to give up its contractual rights, the Del Vecchios threatened to "roll the dice" by throwing Brooks Brothers into bankruptcy and selling the Company as part of those proceedings, in the erroneous belief that such a course would allow them to circumvent their obligations to TAL.  The Del Vecchios made good on their threat, causing the Company to file for bankruptcy and continuing their pre-petition, pre-pandemic sale efforts.  Now, as a result of the Del Vecchios' actions, Brooks Brothers has been sold for a fraction of the price set forth in the 2019 bids, TAL's equity position has been wiped out, and the Del Vecchios have breached their fiduciary and contractual obligations to TAL.  TAL brings this action to recover what it is owed.

2.      TAL's investment in Brooks Brothers originated in 2016, when the Del Vecchios approached TAL and asked it to invest in Brooks Brothers, which was wholly-owned by the Del Vecchios at the time.  TAL's relationship with Brooks Brothers and the Del Vecchios was important to TAL.  Brooks Brothers was TAL's largest customer, and TAL had served as one of

Brooks Brothers' primary garment producers for nearly two decades.  TAL is a 70 year-old, third-generation, family-run garment manufacturing company that is not in the business of making loans or investments.  Nevertheless, to preserve its important vendor relationship with Brooks Brothers and remain in good standing with the Del Vecchios, TAL was willing to consider an investment.  TAL remained concerned about Brooks Brothers' financial performance, however. As discussions throughout the spring of 2016 about a potential investment progressed, the Del Vecchios agreed to protect TAL's investment by making TAL "whole" in the event that the Company was sold at a valuation that fell below the one on which TAL's investment was based. Relying on the Del Vecchios' representations and substantial resources, and to avoid the risk of losing a long-standing customer, TAL agreed to proceed with the transaction.

3.     On June 23, 2016, TAL and its newly created subsidiary, Castle, entered into a Securities Purchase Agreement with Brooks Brothers.  A few days later, on July 1, 2016, Castle entered into a Stockholders Agreement with the Del Vecchios that contained a make-whole provision (the "Make-Whole Provision") that memorialized the Del Vecchios' agreement to make TAL whole in the event that the Company sold at a valuation that fell below TAL's investment. Stockholders Agreement, Ex. A.  Under these agreements, TAL invested a total of $100 million in Brooks Brothers — including $50 million of equity and $50 million pursuant to a convertible note — and became a minority shareholder in Brooks Brothers.  This was the single largest investment TAL has ever made in another company.

4.     By early 2019, it was clear that Brooks Brothers was not performing as the Del Vecchios had projected.  As a result of deteriorating financing metrics, they began soliciting offers for Brooks Brothers from potential third-party buyers. Despite the fact that TAL had substantial rights and interest in such a process, the Del Vecchios conducted the sale process on their own,

shielding it from the view of Brooks Brothers' Board of Directors and its minority shareholder, TAL. Notwithstanding the secrecy, TAL eventually learned that the Del Vecchios had received several attractive indications of interest to purchase the Company that would have allowed Brooks Brothers to avoid bankruptcy. The Del Vecchios did not pursue any of these sale opportunities for one simple reason: each of these bids reflected a lower valuation than TAL's initial investment and would have triggered the Del Vecchios' obligations under the Make-Whole Provision and required them to dip into their own pockets to pay TAL millions of dollars at closing. Rather than acting in the best interests of the Company, TAL, and other stakeholders, the Del Vecchios refused to pursue value-maximizing bids in an attempt to avoid their independent financial obligations to TAL. The Del Vecchios then demanded that TAL take a "haircut" on its "make whole rights" before the Del Vecchios would pursue any sale that would trigger the Make-Whole Provision. When TAL refused, the Del Vecchios threatened that instead of pursuing the bids on the table, they would "roll the dice" and sell Brooks Brothers as part of bankruptcy proceedings in an unfounded effort to evade the Make-Whole Provision.

5.     The Del Vecchios did just that. On July 8, 2020, Brooks Brothers filed a petition under Chapter 11 of the Bankruptcy Code. Shortly thereafter, on August 31, 2020, the Bankruptcy Court overseeing Brooks Brothers' estate approved a sale of substantially all of Brooks Brothers' assets to a third-party buyer. The Brooks Brothers sale triggered the Make-Whole Provision in TAL's agreement with the Del Vecchios. But the Del Vecchios have refused to honor their agreement and pay TAL what they owe. TAL now brings this lawsuit to enforce its contractual rights and its rights as a minority shareholder.

## PARTIES

6.     Plaintiff Castle Apparel Limited ("Castle") is a Hong Kong limited company.  On June 23, 2016, Castle entered into a Securities Purchase Agreement with Brooks Brothers Group, Inc.  On July 1, 2016, Castle executed a Stockholders Agreement with Brooks Brothers Group, Inc., the CDV Trust, the CDV 2010 Annuity Trust, the Del Vecchio Family Trust, Delfin S.A.R.L., and DV Family LLC.  Under these agreements, Castle acquired 148,025 shares of Brooks Brothers for $50 million.  Castle is a wholly-owned subsidiary of Plaintiff TAL Apparel Limited.

7.     Plaintiff TAL Apparel Limited ("TAL") is a Hong Kong limited company.  TAL is the parent company of Castle and was a limited signatory to the June 23, 2016 Securities Purchase Agreement.

8.     On information and belief, Defendant Claudio Del Vecchio is the Trustee of the Del Vecchio Family Trust.  The Del Vecchio Family Trust is a New York trust, organized under the laws of New York.  The Del Vecchio Family Trust was a Principal Stockholder of Brooks Brothers Group, Inc. Class A Common Stock and executed the Stockholders Agreement on July 1, 2016.  On information and belief, Claudio Del Vecchio is at least one of the beneficiaries of this Trust.  On information and belief, The Del Vecchio Family Trust is an alter ego of Claudio and Matteo Del Vecchio.

9.     Defendant Peak Trust Company, formerly known as Alaska Trust Company, is an Alaska corporation.  On information and belief, the Alaska Trust Company was renamed as Peak Trust Company between July 1, 2016 and July 2020.  On information and belief, Defendant Peak Trust Company is the Trustee of The CDV Trust, the CDV 2010 Annuity Trust, and The CDV 2015 Annuity Trust.  The CDV Trust, The CDV 2010 Annuity Trust, and The CDV 2015 Annuity Trust are organized under the laws of Alaska.  The CDV Trust and The CDV 2010 Annuity Trust

were Principal Stockholders of Brooks Brothers Group, Inc. Class A Common Stock and executed the Stockholders Agreement on July 1, 2016.  On information and belief, The CDV Trust and The CDV 2010 Annuity Trust transferred their ownership of Class A Common Stock to The CDV 2015 Annuity Trust between July 2016 and July 2020, and The CDV 2015 Annuity Trust assumed the obligations of the Stockholders Agreement at that time.  On information and belief, Claudio Del Vecchio is at least one of the beneficiaries of each of these trusts.  On information and belief, The CDV Trust, The CDV 2010 Annuity Trust, and The CDV 2015 Annuity Trust are alter egos of Claudio and Matteo Del Vecchio.

10.     Defendant DV Family LLC is a Delaware limited liability company.  DV Family LLC was a Principal Stockholder of Brooks Brothers Group, Inc. Class A Common Stock and executed the Stockholders Agreement on July 1, 2016.  On information and belief, Claudio Del Vecchio is the President of DV Family LLC.  On information and belief, DV Family LLC is an alter ego of Claudio and Matteo Del Vecchio.

11.     Defendant Delfin S.A.R.L is a Luxembourg company.  Delfin S.A.R.L. was a Principal Stockholder of Brooks Brothers Group, Inc. Class A Common Stock and executed the Stockholders Agreement on July 1, 2016.  On information and belief, Leonardo Del Vecchio, the father of Claudio Del Vecchio, is the President and controlling shareholder of Delfin S.A.R.L.  On information and belief, Delfin S.A.R.L is the holding company for the Del Vecchio family's investments in several publicly-held corporations including EssilorLuxottica and Mediabanco SpA.  On information and belief, Delfin S.A.R.L is an alter ego of Claudio and Matteo Del Vecchio, in addition to other members of the Del Vecchio family.

12.     The foregoing Defendants, including their affiliated trusts, successors and assigns (collectively, the "Del Vecchio Alter Egos" or the "Del Vecchio Controlled Entities"), are alter egos of Claudio Del Vecchio and Matteo Del Vecchio.

13.     Defendant Claudio Del Vecchio was the Chairman of the Board and Chief Executive Officer ("CEO") of Brooks Brothers Group, Inc.  Claudio Del Vecchio was also the majority shareholder of Brooks Brothers Group, Inc. through his alter ego trusts and corporations.

14.     Defendant Matteo Del Vecchio is Claudio Del Vecchio's son.  He served as the Chief Administrative Officer of Brooks Brothers, and was a majority shareholder of Brooks Brothers Group, Inc. through his alter ego trusts and corporations.

## JURISDICTION

15.     This Court has original jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because it is an action between citizens of a state and citizens of a foreign state.  The amount in controversy is greater than $75,000.

16.     This Court has personal jurisdiction over Claudio Del Vecchio in his capacity as Trustee of The Del Vecchio Family Trust because, under Section 12(k) of the Stockholders Agreement, the Del Vecchio Family Trust and its assigns "irrevocably submit[ted] to the exclusive jurisdiction of" this Court in any "action or proceeding arising out of or relating to" the Stockholders Agreement or the transactions contemplated by it.  Ex. A.  On information and belief, Claudio Del Vecchio is at least one of the beneficiaries of The Del Vecchio Family Trust.  This Court also has personal jurisdiction because The Del Vecchio Family Trust is a New York trust, organized under the laws of New York.

17.     This Court has personal jurisdiction over Peak Trust Company, in its capacity as Trustee of The CDV Trust and The CDV 2010 Annuity Trust, because, under Section 12(k) of

the Stockholders Agreement, each of those Trusts and their assigns "irrevocably submit[ted] to the exclusive jurisdiction of" this Court in any "action or proceeding arising out of or relating to" the Stockholders Agreement or the transactions contemplated by it.  Ex. A.

18.    On information and belief, this Court has personal jurisdiction over Defendant Peak Trust Company, in its capacity of Trustee of The CDV 2015 Annuity Trust, because The CDV 2015 Annuity Trust is an assignee of The CDV 2010 Annuity Trust and The CDV Trust under the Stockholders Agreement.  Under Section 12(k) of the Stockholders Agreement, each of those entities and their assigns "irrevocably submit[ted] to the exclusive jurisdiction of" this Court in any "action or proceeding arising out of or relating to" the Stockholders Agreement or the transactions contemplated by it.  Ex. A.

19.    This Court has personal jurisdiction over Defendants DV Family LLC and Delfin S.A.R.L because, under Section 12(k) of the Stockholders Agreement, each of those defendants and their assigns "irrevocably submit[ted] to the exclusive jurisdiction of" this Court in any "action or proceeding arising out of or relating to" the Stockholders Agreement or the transactions contemplated by it.  Ex. A.

20.    This Court has personal jurisdiction over Defendants Claudio Del Vecchio and Matteo Del Vecchio because they are alter egos of other defendants, the Del Vecchio Controlled Entities.  In addition, Claudio Del Vecchio signed the Stockholders Agreement on behalf of the Del Vecchio Controlled Entities, he is closely related to those entities and this dispute, and enforcement of Section 12(k) of the Stockholders Agreement against him was foreseeable.  On information and belief, this Court also has jurisdiction over Claudio Del Vecchio and Matteo Del Vecchio because they are residents of New York.

21.     Venue in this action is proper in this Court under Section 12(k) of the Stockholders Agreement.  Ex. A.  Under that section, the parties waived any objections to venue in this Court. Venue is also proper under 28 U.S.C. 1391(b) because the Court has personal jurisdiction over the Defendants.

## BACKGROUND

**I.     TAL's Long-Standing Relationship with Brooks Brothers.**

22.     TAL is a third generation, family-owned business and is one of the world's leading apparel manufacturers and wholesalers.  TAL manufactures shirts, blouses, knits, pants, outerwear and suits for many of the most well-known garment brands.  Headquartered in Hong Kong, TAL traces its roots back to 1947, when CC Lee, known locally as the "Textile Man," founded a small cotton spinning company that, over the last 70 years, has grown into a global garment provider. Today, TAL has 11 factories and five offices in seven different countries and employs over 26,000 people worldwide.  TAL manufactures roughly one out of every six dress shirts sold in the United States.

23.     Hailed as the oldest clothing retailer in the United States, Brooks Brothers is a men's fashion brand that operates hundreds of retail stores in the U.S.  TAL is one of Brooks Brothers' largest vendors, manufacturing many of the clothes that Brooks Brothers sells in the U.S. Brooks Brothers, in turn, is TAL's largest customer.  At the time of TAL's investment in June 2016, Brooks Brothers had been a customer for over 18 years and accounted for approximately 20% of TAL's business.

24.     In 2001, Claudio Del Vecchio and his family purchased Brooks Brothers through various entities they control.  Claudio Del Vecchio served as the Company's Chairman and CEO for roughly 19 years.

25.    Brooks Brothers is a closely-held private company.  Until the transactions described in this Complaint, Brooks Brothers was 100% controlled by Claudio Del Vecchio and the other Del Vecchios.

26.    At all times relevant to the conduct in this Complaint, Claudio Del Vecchio was the Chief Executive Officer, Chairman of the Board, and primary owner (through entities he controlled) of Brooks Brothers.  He made business decisions on behalf of the Company and owed a fiduciary duty to maximize the value of the Company, including for TAL as a minority shareholder.

27.    At all times relevant to the conduct in this Complaint, Matteo Del Vecchio was also an owner, officer, employee, and member of the board of Brooks Brothers.  He also owed a fiduciary duty to maximize the value of the Company, including for TAL as a minority shareholder.

28.    Various entities controlled by the Del Vecchio family collectively owned 100% of Brooks Brothers from 2001 until 2016, when the Del Vecchios approached TAL to invest in the Company.

## II.    The Del Vecchios Contact TAL in Early 2016 Seeking an Investment.

29.    TAL's ownership interest in Brooks Brothers originated in 2016.  In early February of that year, the Del Vecchios were looking for additional capital for Brooks Brothers and began approaching potential partners.  In early February 2016, Claudio Del Vecchio and Matteo Del Vecchio reached out to TAL, through TAL's Chief Executive Officer, Roger Lee, about a potential investment.  The parties had a series of conversations in February and March about the potential investment, including its structure and size.  At the time, the Del Vecchios described the purpose of the investment as, among other things, providing capital for Brooks Brothers to expand in Asia.

Even though TAL had never before made any investment or loan of this size to a customer, given that Brooks Brothers was TAL's largest client, TAL agreed to consider the possibility of such a transaction.

30.     On February 15, 2016, TAL executed a non-disclosure agreement with Brooks Brothers to enable discussion about a potential investment.  Brooks Brothers began providing TAL with financial information in early March 2016 and made a proposal about the structure of the investment.  The Del Vecchios were looking for $100 million in capital and initially proposed that TAL make a $65 million equity investment and agree to a $35 million convertible unsecured note.

31.     On March 14, 2016, TAL's CEO Roger Lee met with Claudio Del Vecchio and Matteo Del Vecchio in New York to discuss the potential transaction.  At the meeting, Mr. Lee posed several questions about the need for the investment, the Del Vecchios' plans for TAL, and Brooks Brothers' prospects.  Specifically, TAL asked why Brooks Brothers was looking for outside investment, given that Claudio Del Vecchio and his family have substantial personal resources and could presumably provide capital to the business as needed.  Claudio Del Vecchio assured TAL that Brooks Brothers' prospects were bright, that the funds were needed to facilitate the Company's expansion in Asia, and that Claudio Del Vecchio himself was not providing the additional capital due to "tax reasons."

32.     TAL continued to have concerns about the size of the investment and how it could protect its stake in the business.  In response to TAL's concerns, the parties discussed TAL's desire for safeguards or equity protection measures.  From April 11 to 13, 2016, Richard Coote, the former Senior Vice President of Finance at TAL, met with Claudio Del Vecchio, Matteo Del Vecchio, Brooks Brothers' Chief Financial Officer Steve Goldaper, and Brooks Brothers' financial representatives to continue diligence and discussions regarding a potential TAL investment.  At the meetings, TAL was presented with a Term Sheet for a potential transaction.  Among other

things, the Term Sheet proposed a "drag along" provision that would enable the Del Vecchios to force TAL to sell its shares to a third-party if the Del Vecchios, as Principal Stockholders, sold their entire stake in Brooks Brothers.

33.     After the April meetings, TAL continued to consider the transaction but was not willing to invest without protection for its investment.  In particular, the Del Vecchios' proposed "drag-along" rights were unacceptable to TAL because it was concerned that the Del Vecchios could force TAL to sell its equity for a loss in a future sale.  On or around April 27, 2016, Roger Lee and Delman Lee, Vice Chairman of TAL, met with the Del Vecchios in Hong Kong.  During the meetings, Roger Lee raised these concerns with the Del Vecchios, informing them that TAL needed some protection for its investment to continue pursuing a transaction, given the uncertainty in the retail industry and Brooks Brothers' financials.  He told the Del Vecchios that TAL was not comfortable with the "drag along" provision as then proposed.

34.     During the Hong Kong meeting, TAL also questioned the Del Vecchios about the risk that Brooks Brothers would file for bankruptcy in the future.  Claudio Del Vecchio assured TAL that he would not let Brooks Brothers go bankrupt, indicating that he would personally inject capital into the business if necessary to avoid any bankruptcy filing.

**III.    The Del Vecchios Offer Additional Assurances to Induce TAL's Investment.**

35.     After the meeting on April 27, 2016, the Del Vecchios revised the draft deal documents to address TAL's concerns.  In particular, the Del Vecchios proposed a "make-whole" provision, under which the Del Vecchios could only force TAL to sell its equity in a third-party sale if the sale was for more than TAL's original investment or if the Del Vecchios made TAL "whole" on its investment.  This provision was specifically designed to protect TAL's investment and prevent it from suffering losses in a fire sale situation.

36.     At the same time, the Del Vecchios were pressuring TAL to complete the transaction.  The Del Vecchios, through their representatives, told TAL that, if TAL did not proceed with the investment, the Del Vecchios would approach other parties, including TAL's principal competitors.  The implication of this ultimatum was clear:  the Del Vecchios were threatening to take Brooks Brothers' vendor business with TAL elsewhere if TAL did not agree to go forward with the deal.  Brooks Brothers' annual purchases from TAL comprised roughly 20% of TAL's business.  Losing the Brooks Brothers business would have had a significant detrimental impact on TAL's business, and TAL agreed to move forward.

37.     In May 2016, the parties negotiated a Memorandum of Understanding ("MOU") that set out the key terms of the transaction.  The MOU contemplated a $50 million equity investment (down from $65 million) and a $50 million convertible note from TAL.  The MOU also incorporated the safeguard Make-Whole Provision that the Del Vecchios had proposed.  The parties executed the the MOU on May 16, 2016, and, after further diligence, negotiated a Securities Purchase Agreement and Stockholders Agreement to execute the proposed transaction.

38.     On June 23, 2016, Castle and TAL executed the Securities Purchase Agreement with Brooks Brothers, which provided the terms under which Castle would purchase the minority stake in Brooks Brothers and acquire the convertible note.  Prior to the sale, The CDV Trust held two Unsecured Promissory Notes payable by Brooks Brothers, and The CDV 2010 Annuity Trust held one Unsecured Promissory Note payable by Brooks Brothers.  Before acquiring the convertible note, TAL wanted to ensure that its investment would be protected, and therefore made it a condition of the sale that the Del Vecchio Controlled Entities execute subordination agreements such that TAL's note would be senior and prior in right of payment to the notes held by The CDV Trust and The CDV 2010 Annuity Trust.  One of the purposes of the subordination agreements

was to guarantee that Castle's note would be paid before any notes held by the Del Vecchios or the entities that they control.

39.     On July 1, 2016, Castle entered into the Stockholders Agreement with Brooks Brothers and its stockholders, The CDV Trust, The CDV 2010 Annuity Trust, The Del Vecchio Family Trust, Delfin S.A.R.L. and DV Family LLC.  The Stockholders Agreement governed the relationship between TAL and the Del Vecchios and included the Make-Whole Provision, pursuant to which the Del Vecchios agreed to protect TAL's investment in the event of a downside sale scenario:

> The Principal Stockholders may, at any time, negotiate the terms of, and require each Investor to consummate, a Sale of the Company (1) at a purchase price that is based on a valuation of the Company that is greater than or equal to the Minimum Valuation or (2) if the valuation of the Company is less than the Minimum Valuation, pursuant to which each Investor shall receive (A) the negotiated consideration for the Sale of the Company from the Independent Third Party purchaser and (B) a cash payment from the Company or the Principal Stockholders in an amount equal to the difference between such negotiated consideration and the aggregate amount that the Investor would have received if the valuation of the Company was equal to the Minimum Valuation (an "Approved Sale").

Ex. A at 8.

40.     The Minimum Valuation referenced in the Make-Whole Provision was $652,000,000 in equity value.  Thus, under the Agreement, if the Del Vecchios completed a sale of Brooks Brothers that valued the equity at less than that amount, the Del Vecchios or Brooks Brothers were required to make a "cash payment . . . in an amount equal to the difference between" the consideration TAL would have received based on the Minimum Valuation and the consideration TAL actually received in the sale.  Ex. A at 8.

41.     Importantly, the Stockholders Agreement broadly defines "Sale of the Company" to include several types of transactions.  Among other things, a sale of "all or substantially all of the assets of the Company and its Subsidiaries" qualifies as a "Sale of the Company" that triggers

the make-whole.  Ex. A at 8.  The Stockholders Agreement does not contain any exceptions or carve-outs for sales completed under Chapter 11 of the bankruptcy code.  The Make-Whole Provision applies whether the sale takes place in or outside of bankruptcy.

42.    Castle closed on the acquisition of the equity on July 1, 2016.  Roughly one year later, TAL closed on the convertible note.  Under the terms of the convertible note, TAL could convert its $50 million loan into equity in the Company, making the full amount of TAL's $100 million investment subject to the Make-Whole Provision and protecting TAL's entire investment in Brooks Brothers.

**IV.    The Del Vecchios Refused to Pursue Value-Maximizing Bids for Brooks Brothers in an Attempt to Evade Their Own Financial Obligations to TAL under the Make-Whole Provision.**

43.    After the closing, TAL became a minority shareholder of Brooks Brothers and Roger Lee obtained a seat on the Brooks Brothers Board, but the Del Vecchios maintained voting and managerial control of the Company.  For the next three years, under the Del Vecchios' leadership, Brooks Brothers' business and financial position continued to decline.  By 2019, it was clear that the business was in trouble, and the Del Vecchios began to look at options for selling Brooks Brothers.

44.    On or before March 2019, with the business in decline, the Del Vecchios began a process to find a potential buyer for Brooks Brothers.  While the sale process was purportedly undertaken on behalf of Brooks Brothers and was paid for by Brooks Brothers, the process was initiated without Board knowledge, approval, or notice.  Instead, the process was directed by Claudio Del Vecchio individually, for his own benefit, and proceeded in a secretive manner outside of view of the Board and was fraught with self-interested decisions.  Without bringing the issue to the Board, the Del Vecchios hired investment banker PJ Solomon to assist with the sale process.

15

Reporting directly to Claudio Del Vecchio, rather than the Board, and without TAL's knowledge, PJ Solomon began contacting potential strategic investors or buyers in March 2019, contacting a total of ██ different entities. There was robust interest in a transaction from third-parties. Indeed, ████████ entities signed a non-disclosure agreement and received a confidential information memorandum. ████ entities were given access to a data room to provide preliminary views on preferred transaction structures as part of a going concern sales process. After further discussions, PJ Solomon eventually received initial indications of interest from ████ of those entities: ██████████████████████████. On information and belief, Claudio Del Vecchio directed PJ Solomon to explore potential sale transactions that would benefit the Del Vecchios, rather than Brooks Brothers as a whole. In particular, on information and belief, the Del Vecchios instructed PJ Solomon to explore only those transactions that would allow the Del Vecchios to avoid their make-whole obligations to TAL. Indeed, on information and belief, PJ Solomon analyzed each potential transaction based on the proceeds that Claudio Del Vecchio and the other Defendants would receive from such a sale, rather than focusing on the impact on Brooks Brothers as a whole.

45.     Despite its seat on the Brooks Brothers Board and its ownership interest, TAL did not learn about the sales process from the Del Vecchios directly or during any meetings of the Board. Instead, Roger Lee learned that the process had been initiated from Steve Goldaper, Brooks Brothers' CFO. TAL only learned certain details of the sales process after Roger Lee requested additional information from Mr. Goldaper. It was only upon obtaining information from Goldaper that TAL learned that PJ Solomon was directed only to explore transactions that would include 100% of Brooks Brothers' issued and outstanding shares, including TAL's ownership interest, thereby implicating the Del Vecchios' personal make-whole obligations to TAL. On information

and belief, the Del Vecchios deliberately cut TAL out of the sales process in order to pursue a transaction that would benefit them personally.

46.     The initial indications of interest valued the Brooks Brothers' enterprise over a range from ████████████████████████ Notably, each of these indications of interest was below the "Minimum Valuation" in the Stockholders Agreement and thus triggered the Del Vecchio's make-whole obligations to TAL. Although these indications of interest would require the Del Vecchios personally to make TAL whole, each offer provided substantial value for the shareholders and avoided the prospect of a chapter 11 filing.  The bid with a high range of ████

████████████████████████████████████████████████████

████████ Given Brooks Brothers' prospects at the time, the Del Vecchios should have brought each of these indications of interest to TAL and the Board and pursued them in good faith and with all practical haste.

47.     Unfortunately, the Del Vecchios did no such thing.  Instead, they analyzed each of the indications of interest in terms of their own family's bottom line, to the detriment of Brooks Brothers and TAL, as the minority shareholder. ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████ In other words, they were not looking at whether each transaction maximized value for Brooks Brothers and its shareholders as a whole. Instead, the Del Vecchios were focused on whether each deal benefitted them personally, after accounting for their separate and independent obligations to TAL.

48.     The Del Vecchios considered other potential transactions to avoid bankruptcy and keep the Company afloat as well. ████████████████████████████████████

████████████████████    ████████████████████████████████

████████████████████████████████████████████████████████

████    Upon information and belief, after receiving PJ Solomon's analysis, the Del Vecchios did not pursue a minority investment to save the business.

49.    After the initial indications of interest came in, the interested buyers proceeded to conduct due diligence on the business.  But, on information and belief, the Del Vecchios never met with any interested buyer.  Because the Del Vecchios had run the business for nearly two decades, they had significant knowledge about its performance and prospects, and their refusal to meet with any interested buyer sabotaged and doomed the diligence process that any responsible buyer would conduct.

50.    Rather than pursue meaningful negotiations with interested bidders, the Del Vecchios instead chose to look elsewhere, hoping to find a buyer that would offer a price high enough to avoid their make-whole obligation.    ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████    ████████████████████

████████████████████████████████████████████████

████████████████████████████████████

51.    Once again, the Del Vecchios received  ████  attractive bids for the business.[1]

████████████████████████████████████████████████

---

[1]   Of course, by this time, Brooks Brothers had continued to perform poorly and its prospects declined.  ████████████████
████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████ Once again, the Del Vecchios did not bring these bids to the Board.

52.     A rational steward and majority shareholder operating in good faith would have pursued these multiple significant bids.  But the Del Vecchios chose not to, and their reasons became clear to TAL later that month.  On November 20, 2019, Roger Lee had dinner with Claudio and Matteo Del Vecchio in New York, the night before a Brooks Brothers board meeting.  At the time, the Del Vecchios had each of the revised indications of interest in hand, but had not brought them to TAL or the Board.  Indeed, Lee only learned of the indications of interest by asking for them directly from Mr. Goldaper a few days earlier.  But, because each of the indications of interest was less than the Minimum Valuation in the Stockholders Agreement, completing the transactions would have triggered the Del Vecchios' make-whole obligations to TAL.

53.     Near the end of the dinner, the discussion turned to sale opportunities, and Claudio Del Vecchio brought up the subject of TAL's make-whole right.  Specifically, Mr. Del Vecchio stated that he would not pursue any sale of Brooks Brothers that required him to make TAL whole.  Instead, he asked if TAL would be willing to take a "haircut" on its make-whole right so that the Del Vecchios could accept a lower offer and not pay TAL the full amount they owed.  Mr. Lee

19

responded that he would have to speak with TAL's shareholder, Mr. Delman Lee, but that he did not expect TAL would agree to take any "haircut." Mr. Lee emphasized that the Parties' Stockholders Agreement required the Del Vecchios to make TAL whole in any sale scenario and that TAL intended to enforce its rights. Claudio Del Vecchio reiterated that he would not pursue any offers that triggered his obligations to TAL under the Make-Whole Provision. Mr. Del Vecchio then threatened that if TAL did not take a "haircut" on its make-whole rights, he would "roll the dice" and throw the Company into bankruptcy. Mr. Lee replied that any sale, even in bankruptcy, would trigger TAL's make-whole right, and Mr. Del Vecchio warned that was not his understanding.

54.     After the November 20, 2019 dinner, TAL continued to push the Del Vecchios to honor their contractual and fiduciary obligations. In December 2019, Delman Lee flew from Hong Kong to New York to meet personally with Claudio Del Vecchio and press TAL's rights. At the meeting on December 20, Delman Lee reiterated that TAL would not take any "haircut" on its make-whole rights, that TAL expected the Del Vecchios to fulfill their legal obligations and pursue sale offers in good faith, and that TAL expected the Del Vecchios to honor their commitment to make TAL whole in the event of a sale. Claudio Del Vecchio again asserted that, if Brooks Brothers filed for bankruptcy, the Del Vecchios believed they could avoid their make-whole obligations to TAL and were willing to allow that to happen to avoid paying TAL under the Make-Whole Provision. Delman Lee responded that the Make-Whole Provision was not limited in that way and applied to sales of the Company regardless of whether such a sale took place in bankruptcy. After further discussion, the meeting concluded with Mr. Del Vecchio telling Mr. Lee that "we have a different perspective on the issue."

55.     The Del Vecchios were explicit about their intentions.  They refused to honor their agreement with TAL and refused to pursue any sale that would require the Del Vecchios to pay TAL under the Stockholders Agreement and expose the Del Vecchios to personal liability—no matter how much such a sale would yield for the Company or TAL as a minority shareholder.  In short, the Del Vecchios put their own personal interests in front of those of Brooks Brothers, TAL and other stakeholders and thwarted TAL's ability to get the bargained-for benefit of the Make-Whole Provision.

56.     Because of the Del Vecchios' controlling interest in Brooks Brothers and complete domination of the Board, TAL had no ability to force the Del Vecchios to consider the beneficial sale opportunities before the Company.

57.     On information and belief, the Del Vecchios' refusal to pursue any of the sale proposals was not in good faith but was done solely in an effort to avoid honoring TAL's clear and unequivocal right to be made whole under the Make-Whole Provision of the Stockholders Agreement.

## V.     The Del Vecchios Attempt to Avoid Their Make-Whole Obligations to TAL by Preparing to Sell the Company in Bankruptcy.

58.     On information and belief, the Del Vecchios did not engage in good faith with the potential buyers in 2019 or before filing for bankruptcy in 2020.  Indeed, throughout the process, the Del Vecchios refused to meet personally with the bidders, despite their requests.  Nor did the Del Vecchios make any counterproposals to the bidders in an effort to negotiate or raise their bids. Instead, they met these bids with inaction.

59.     As a result, Brooks Brothers lost the ability to capitalize on any of the bids.  The Del Vecchios simply ignored the indications of interest from █████████████████████████

█████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████    Once again, the Del Vecchios refused to bring this bid to the Brooks Brothers' Board.  Rather, on information and belief, the Del Vecchios simply never responded to this bid.

60.    Instead of pursuing these valuable sale opportunities in good faith, the Del Vecchios began to prepare to make good on Claudio Del Vecchio's threat to "roll the dice" and pursue a sale through the bankruptcy process.  The Del Vecchios began these preparations well before the COVID-19 pandemic affected the United States retail market.  In addition to continuing to consult with PJ Solomon, in ███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████    Shortly thereafter, the COVID-19 pandemic hit the United States and retailers, further complicating the sale process.

## VI.    Brooks Brothers Is Sold in Chapter 11.

61.    On July 8, 2020, Brooks Brothers filed a voluntary petition for Chapter 11 reorganization in the District of Delaware.  The filing reflected an effort to continue the sale process begun in early 2019 in a way that the Del Vecchios hoped could be done outside the reach of the Make-Whole Provision.  Indeed, at the time of the bankruptcy filing, Claudio Del Vecchio acknowledged that he had already begun "evaluat[ing] . . . [a] potential sale of the business" before

22

the COVID-19 pandemic and that the bankruptcy filing was the "next step" in the process of "[s]eeking protection to facilitate an efficient sale of the business."  Thus, the bankruptcy sale process was only a continuation of the Del Vecchios' pre-petition sale efforts.

62.    Shortly after filing, Brooks Brothers filed a motion to approve bidding procedures for a Section 363 sale of all or substantially all of the Company's assets (the "Section 363 Sale"). On August 14, 2020, the Bankruptcy Court approved the Section 363 Sale of substantially all of Debtors' assets to the Stalking Horse Bidder, SPARC Group, LLC.  Subject to certain adjustments contemplated by the Asset Purchase Agreement, SPARC Group, LLC agreed to pay approximately $325 million in consideration for the Debtors' Assets.  The approved bid is substantially less than — more than ███████ below — the bids the Del Vecchios refused to pursue during the secretive and self-interested sales process they initiated over a year prior to the eventual Section 363 Sale.  While the depressed bankruptcy sale amount caused TAL to lose well over $50 million, the Del Vecchios stand to personally benefit from the bankruptcy sale:  if not for this lawsuit, the Del Vecchios' ploy to evade their make-whole obligations to TAL could save them tens of millions of dollars in personal liabilities.

63.    The Section 363 Sale was a "Sale of the Company" under the Stockholders Agreement because it was a sale of all or substantially all of Brooks Brothers' assets.  And because the sale was for far less than the "Minimum Valuation" in the Stockholders Agreement, it triggers TAL's make-whole right.  As a result of the sale, the Del Vecchios now owe TAL the difference between their eventual recovery under the sale and the amount it would have recovered at the Minimum Valuation, among other damages — an amount in excess of $100 million.

## ALTER EGO ALLEGATIONS

**VII.    Each of the Parties to the Stockholders Agreement Are Alter Egos of the Del Vecchios.**

64.    Claudio Del Vecchio and Matteo Del Vecchio completely dominate each of the parties to the Stockholders Agreement.

65.    On information and belief, the Del Vecchios have complete control over the management and finances of the Del Vecchio Controlled Entities.

66.    While the Del Vecchio Controlled Entities were nominal stockholders of Brooks Brothers, the Del Vecchios held themselves out as the owners of the businesses.  That is because there is no functional or practical difference between the stockholder entities and the Del Vecchios.[2]

67.    When the Del Vecchios began to consider a Brooks Brothers sale in 2019, on information and belief, Claudio Del Vecchio and Matteo Del Vecchio, on their own behalf and on behalf of the Del Vecchio Controlled Entities, directed Brooks Brothers' financial advisor, PJ Solomon, to find a buyer who would make an offer that was favorable to them as individuals and to the Del Vecchio Controlled Entities.  Indeed, PJ Solomon did not present the findings of its search for a buyer to the Brooks Brothers Board of Directors.  Rather, PJ Solomon reported to and took directions from the Del Vecchios.

68.    On information and belief, Claudio Del Vecchio and Matteo Del Vecchio used corporate funds and property of the Del Vecchio Controlled Entities for personal uses and

---

[2]    Maria Teresa Cometto, *Claudio Del Vecchio: The Key to Success is in Learning How to Listen*, i-Italy (Oct. 22, 2018),        http://www.iitaly.org/magazine/focus/art-culture/article/claudio-del-vecchio-key-success-in-learning-how-listen (Claudio del Vecchio explaining why he decided to buy Brooks Brothers); Lynnley Browning, *Private Sector;   Crown   Jewel   for   a   Fashion   Heir?*,   N.Y.   Times   (Dec.   23,   2001), https://www.nytimes.com/2001/12/23/business/private-sector-crown-jewel-for-a-fashion-heir html ("Mr.  Del Vecchio, who agreed to pay $225 million to Marks & Spencer, the British retailer, for Brooks Brothers, said he bought it because he wanted men's clothing in his lineup and because the company was a good buy[.]").

obligations and made decisions regarding the Del Vecchio Controlled Entities in such a way as to benefit themselves personally.

69.     On information and belief, the trustees and beneficiaries of the Del Vecchio Controlled Entities are members of the Del Vecchio family, including Claudio Del Vecchio and Matteo Del Vecchio.

70.     On information and belief, Claudio Del Vecchio and Matteo Del Vecchio exercised their domination over the Del Vecchio Controlled Entities to breach the Del Vecchio Alter Egos' obligations under the Stockholders Agreement.

71.     On information and belief, Claudio Del Vecchio and Matteo Del Vecchio exercised their domination over the Del Vecchio Controlled Entities to violate their duties of good faith and fair dealing under the Stockholders Agreement.

72.     Allowing Claudio Del Vecchio and Matteo Del Vecchio to hide behind the shell of the Trusts and other entities they established and control would permit them to work a fraud against TAL and TAL's stakeholders.

## COUNT I - BREACH OF CONTRACT (AGAINST ALL DEFENDANTS)

73.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 72.

74.     The Stockholders Agreement is a binding contract between the parties.

75.     Plaintiffs have fully performed their obligations under the Stockholders Agreement, including by providing the $50 million equity investment and the $50 million convertible note to Brooks Brothers.

76.     The Stockholders Agreement provides, in the event of a "Sale of the Company" at a purchase price below the "Minimum Valuation," Plaintiffs are entitled to receive the negotiated consideration plus "a cash payment from the Company or the Principal Stockholders in an amount

equal to the difference between such negotiated consideration and the aggregate amount that the Investor would have received if the valuation of the Company was equal to the Minimum Valuation."

77.     The sale of Brooks Brothers' assets to SPARC Group, LLC in December 2020 was a "Sale of the Company" under the Stockholders Agreement.  Further, by commencing the Chapter 11 restructuring to pursue a Section 363 sale, the Principal Stockholders required the Plaintiffs to consummate a "Sale of the Company."

78.     The "negotiated consideration" that Plaintiffs will receive from the Section 363 Sale is less than the "aggregate amount that the [Plaintiffs] would have received if the valuation of the Company was equal to the Minimum Valuation."

79.     Therefore, Defendants are required to make a cash payment to Plaintiffs of the difference in the "negotiated consideration" and "aggregate amount that the [Plaintiffs] would have received if the valuation of the Company was equal to the Minimum Valuation."

80.     Defendants the CDV Trust, the CDV 2010 Annuity Trust, the Del Vecchio Family Trust, Delfin S.A.R.L. and DV Family LLC are contractually obligated to make TAL whole under the Stockholders Agreement.  As alter egos of the Del Vecchio Controlled Entities, Claudio Del Vecchio and Matteo Del Vecchio are also personally liable for Plaintiffs' damages.

## COUNT II - BREACH OF GOOD FAITH AND FAIR DEALING
### (AGAINST ALL DEFENDANTS)

81.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 72.

82.     As a result of the parties' contractual relationship, Defendants owed Plaintiffs a duty of good faith and fair dealing.

83.     Defendants breached that duty in 2019 when they would not consider any potential sale of Brooks Brothers that required them to exercise the make-whole right in the Stockholders Agreement, no matter how much value such a sale would yield to Brooks Brothers or TAL.

84.     Defendants received several bids for the purchase of Brooks Brothers in 2019 that far exceeded the ultimate sale price in the Section 363 Sale.  Defendants' refusal to pursue these bids unless Plaintiffs waived their make-whole right was in bad faith and prevented Plaintiffs from receiving the "fruits" of the Stockholders Agreement.

85.     The parties had explicitly included the Make-Whole Provision as a protection on the value of Plaintiffs' investment.  Defendants' demand that Plaintiffs waive their make-whole rights had the effect of eliminating that provision from the contract.

86.     Defendants' bad faith conduct caused Plaintiffs' damages.

87.     As named parties to the Stockholders Agreement, the Del Vecchio Controlled Entities are liable for Plaintiffs' damages.  As alter egos of the Del Vecchio Controlled Entities, Claudio Del Vecchio and Matteo Del Vecchio are also personally liable for Plaintiffs' damages.

## COUNT III -- BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS)

88.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 72.

89.     Brooks Brothers was a closely-held corporation in 2019.

90.     Defendants controlled, directly or indirectly over 50% of Brooks Brothers stock and were majority shareholders of the Company.

91.     Castle was a minority shareholder of the Company.

92.     As majority shareholder, Defendants owed fiduciary duties to Castle.

93.     Defendants breached those duties by acting in bad faith when they refused to consider any sale transactions that would trigger TAL's rights under the Make-Whole Provision

in the parties' Stockholders Agreement.  Indeed, Defendant Claudio Del Vecchio expressly demanded that TAL take a "haircut" on its make-whole rights as a condition of the Defendants pursuing actionable, value-maximizing sales of Brooks Brothers in 2019.  In doing so, Defendants placed their own financial interests above the interests of shareholders as a whole.

94.     Defendants substantially harmed TAL, a minority shareholder, because of Defendants' desire to avoid their own financial obligations to Plaintiffs.

95.     Plaintiffs suffered damages as a result of Defendants' breach.

96.     As majority shareholders in the Company, the Del Vecchio Controlled Entities are liable for Plaintiffs' damages.   As alter egos of the Del Vecchio Controlled Entities, Claudio Del Vecchio and Matteo Del Vecchio are also personally liable for Plaintiffs' damages.

## COUNT IV - TORTIOUS INTERFERENCE WITH CONTRACT (AGAINST CLAUDIO DEL VECCHIO)

97.     Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 72.

98.     Claudio Del Vecchio tortiously interfered with TAL's contracts with Brooks Brothers' and the Del Vecchio Controlled Entities, forced Brooks Brothers and the Del Vecchio Controlled Entities to breach these contracts, and caused Plaintiffs harm.

99.     TAL had various contracts with Brooks Brothers and the Del Vecchio Controlled Entities.  First, Brooks Brothers and the Del Vecchio Controlled Entities executed the Stockholders Agreement with TAL.  Under that agreement, the Del Vecchio Controlled Entities and Brooks Brothers owed make-whole obligations to TAL.  Second, Brooks Brothers executed a $50 million unsecured note with TAL in 2017.

100.    Claudio Del Vecchio was well aware of both of these obligations. Mr. Del Vecchio was the Chairman and CEO of Brooks Brothers at the time it entered into the contracts.  Indeed, Mr. Del Vecchio signed the Stockholders Agreement on behalf of Brooks Brothers and the Del

Vecchio Family Trust.  He also signed the Securities Purchase Agreement that obligated Plaintiffs to purchase the Note on Brooks Brothers' behalf.

101.    Claudio Del Vecchio improperly caused Brooks Brothers and the Del Vecchio Controlled Entities to breach their obligations under these contracts.  As described above, Claudio Del Vecchio refused to consider or explore any purchase offers for Brooks Brothers that would have triggered the make-whole obligations.  Instead, he caused the Del Vecchio Controlled Entities and Brooks Brothers not to honor their obligations to Plaintiffs under either the Stockholders Agreement or the Note.

102.    Claudio Del Vecchios' actions were improper and not justified.  As the Chairman and majority shareholder of Brooks Brothers, Claudio Del Vecchio was in a position of trust and power with respect to Brooks Brothers, as well as the Del Vecchio Controlled Entities.  He abused those positions to cause Brooks Brothers and the Del Vecchio Controlled Entities to breach their contractual obligations to TAL.  Claudio Del Vecchios' actions were also intentional.  As described above, Claudio Del Vecchio explicitly told TAL's CEO that he would not entertain any offers for Brooks Brothers that triggered the make-whole obligations and would instead "roll the dice" in bankruptcy.  Thus, Claudio Del Vecchio was well aware of Brooks Brothers' and the Del Vecchio Controlled Entities' obligations and intentionally and purposefully caused Brooks Brothers and the Del Vecchio Controlled Entities to breach those obligations.

103.    Claudio Del Vecchios' actions caused Plaintiffs' damages.  As a result of the breaches that Claudio Del Vecchio caused, TAL has not recovered under the Make-Whole Provision in the Stockholders Agreement and has not recovered the full amount of the Note.  As a result, Plaintiffs are entitled to damages from Claudio Del Vecchio in the amount $100 million

less any amounts Plaintiffs ultimately recover from Brooks Brothers through its Chapter 11 proceedings.

## COUNT V - FRAUDULENT INDUCEMENT (AGAINST CLAUDIO DEL VECCHIO)

104.    Plaintiffs repeat and re-allege the allegations in paragraphs 1 through 72.

105.    Claudio Del Vecchio fraudulently induced Defendants to enter into the Stockholders Agreement and Securities Purchase Agreement, causing Plaintiffs' damage.

106.    *First*, Claudio Del Vecchio misrepresented his intentions regarding Brooks Brothers.  During the negotiations for the Stockholders Agreement and the Securities Purchase Agreement, Plaintiffs' representatives conveyed their concerns regarding a potential Brooks Brothers bankruptcy.  Plaintiffs knew that Claudio Del Vecchio and his family had substantial resources and therefore had the means to keep Brooks Brothers out of bankruptcy.  Plaintiffs' representatives asked Claudio Del Vecchio if he would use his own funds to keep Brooks Brothers out of bankruptcy.  Claudio Del Vecchio assured Plaintiffs that he would do so.  Mr. Del Vecchio further represented that the Del Vecchios would make Plaintiffs whole in the event of any sale of the Company, including in a downside scenario, thereby assuring Plaintiffs that their investment was protected.

107.    *Second*, Claudio Del Vecchio knew these statements were false at the time he made them.  Despite his representations, Mr. Del Vecchio did not have any intention of using his own money to keep Brooks Brothers out of bankruptcy or compensating Plaintiffs in compliance with the Make-Whole Provision.

108.    *Third*, Claudio Del Vecchio made these false statements with the purpose of inducing Plaintiffs to enter into the Stockholders Agreement and Securities Purchase Agreement.  At the time of the statements, Claudio Del Vecchio wanted Plaintiffs to invest $100 million into

Brooks Brothers, but knew that Plaintiffs would not do so without assurances that Plaintiffs' investment would be protected in the event that Brooks Brothers' financial position declined.

109.   *Fourth*, Plaintiffs justifiably relied on Claudio Del Vecchio's statements.

110.   *Fifth*, as a result of Claudio Del Vecchio's statements, Plaintiffs suffered damages. Claudio Del Vecchio's statements induced Defendants to enter into the Stockholders Agreement and Securities Purchase Agreement and invest $100 million into Brooks Brothers.  That investment is now nearly worthless.  Therefore, Claudio Del Vecchio is liable to Plaintiffs in an amount equal to $100 million less any amounts Plaintiffs recover from Brooks Brothers' bankruptcy estate, in addition to fees, costs and other relief as may be appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for the entry of judgment in its favor and for relief, as follows:

A.   damages caused to Plaintiffs by Defendants' breach of contract in an amount to be determined at trial;

B.   damages caused to Plaintiffs by Defendants' breach of the implied covenant of good faith and fair dealing in an amount to be determined at trial;

C.   damages caused to Plaintiffs by Defendants' breach of fiduciary duty in an amount to be determined at trial;

D.   damages caused to Plaintiffs by Defendants' tortious interference with contract in an amount to be determined at trial;

E.   damages caused to Plaintiffs by Defendants' fraudulent inducement in an amount to be determined at trial; and

F.   such other and further relief as is just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury in this action of all issues so triable.

Dated: New York, NY
       May 17, 2021

**KIRKLAND & ELLIS LLP**

A. Katrine Jakola, P.C.
James R.P. Hileman (*pro hac vice*
*forthcoming*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
United States
Telephone: +1 312 862 2000
Facsimile: +1 312 862 2200

*Attorneys for Plaintiffs*

32